# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

Assigned on Briefs at Knoxville May 15, 2012

## STATE OF TENNESSEE v. ALFONZO MARQUIS SUTTON

**Direct Appeal from the Circuit Court for Bedford County**
**No. 17094     Lee Russell, Judge**

**No. M2011-01575-CCA-R3-CD - Filed February 4, 2013**

A Bedford County Circuit Court Jury convicted the appellant, Alfonzo Marquis Sutton, of conspiracy to sell and deliver .5 grams or more of a Schedule II controlled substance, cocaine.  The trial court sentenced him as a Range III persistent offender to thirteen years, forty-five percent of which he was to serve in confinement before being eligible for release. On appeal, the appellant argues that the evidence is insufficient to support the conviction, that prosecutorial misconduct warranted a mistrial, and that his sentence is excessive.  Upon review, we conclude that prosecutorial misconduct warrants a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed,**
**and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Trisha A. Bohlen, Bell Buckle, Tennessee, and Brenda Bramlett, Shelbyville, Tennessee, for the appellant, Alfonzo Marquis Sutton.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Michael David Randles and Richard A. Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

At trial, Deputy Tim Miller, the Assistant Director of the Seventeenth Judicial District Drug Task Force, testified that on April 15, 2009, he and fellow task force agents Shane

George, Chad Webster, and Billy Ostermann went to room 20 of the Blue Ribbon Inn to investigate reports of suspicious activity. Deputy Miller said Agent Webster knocked on the door of the room. A man inside, Tommy McChristian, asked who had knocked, and Webster responded, "'Chad.'" McChristian replied that he did not know anyone by that name. Deputy Miller stepped closer to the door, identified himself, and said, "'I am a police officer. Would you open the door?'" McChristian opened the door and allowed the officers to come into the room. Deputy Miller saw Patty Butler sitting in a chair beside the bed. Two crack pipes were in the room; one was on the bed, and the other was on an ashtray on a table.

Deputy Miller testified that he told McChristian why the agents were there. While talking with McChristian, he noticed that McChristian had a piece of crack cocaine in his mouth. McChristian removed the cocaine from his mouth and gave it to Deputy Miller. Deputy Miller said the agents searched McChristian and found "maybe a couple gram piece" of crack cocaine in his watch pocket. McChristian told Deputy Miller that he and Butler checked into the motel room earlier that day. Deputy Miller interviewed McChristian while other agents interviewed Butler. As a result of the interviews, Deputy Miller asked McChristian to telephone the appellant and have crack cocaine delivered to the room. McChristian agreed and used Butler's cellular telephone to make the call. Deputy Miller said he recorded the conversation and heard the conversation as it was being recorded. The State played the recording for the jury, which included the following exchange:

> McChristian: Will you bring me a bill?
>
> The appellant: Yo, give me a few [minutes], I'll be over there.
>
> McChristian: How long?
>
> The appellant: Give me about ten minutes. If I don't come, my
> auntie will be there, but we'll be right there.

Deputy Miller explained that "a bill" was "street slang for $100 worth of crack cocaine."

Deputy Miller testified that about fifteen minutes later, a car registered to the appellant pulled up outside the motel room. Two women were in the car; the driver was the appellant's aunt, Doris Ann Knox. Knox got out of the car and knocked on the door of room 20. Deputy Miller said that when he opened the door, Knox appeared surprised and dropped a few pieces of crack cocaine onto the ground. Deputy Miller described the amount of crack cocaine as "just enough to maybe smoke a little bit." Agent Webster collected the cocaine and gave it to Deputy Miller. Deputy Ostermann searched Knox and found a plastic baggie containing about one gram of cocaine in a pocket of her clothing. Knox also had on her person a crack

pipe and a "push rod," which Deputy Miller described as "a little metal piece" used to load crack into a crack pipe. Knox then pulled cocaine wrapped in a napkin out of her bra and gave it to Deputy Miller. Deputy Miller interviewed Knox.

On cross-examination, Deputy Miller testified that Knox told him that she was going to smoke the cocaine she was holding in her hand and that she was going to sell the cocaine in her pocket to McChristian. He acknowledged that a person who delivered drugs for someone else was often paid in drugs for making the delivery. He explained, "They are given a piece of dope or cocaine for the transaction. That is a general payment 99 times out of 100." He estimated the value of the cocaine in the baggie as "about $100 worth of crack."

Tommy McChristian testified that on April 15, 2009, he rented a room at the Blue Ribbon Inn. McChristian wanted to smoke cocaine with Patty Butler, so he telephoned the appellant and ordered $300 dollars worth of cocaine. The appellant delivered the cocaine to McChristian's motel room. At some point, drug task force agents arrived, and McChristian turned over the cocaine to them. He said he also telephoned the appellant and ordered "a bill," which was an amount of cocaine worth $100. The appellant told McChristian that he or his "auntie" would make the delivery. About fifteen minutes later, Doris Knox knocked on the door, and the agents answered it. McChristian said that the State had not made him any promises in exchange for his testimony but that he hoped to get some favorable treatment for testifying against the appellant.

Agent Chad Webster testified that he and other agents went to room 20 of the Blue Ribbon Inn on April 15, 2009. Agent Webster knocked on the door and stated his first name. McChristian said that he did not know anyone named Chad. The agents identified themselves, and McChristian opened the door. At some point, McChristian placed a call to the appellant and ordered some cocaine, and Doris Knox delivered the cocaine to the room. She dropped a small amount of cocaine from her left hand, and Agent Webster collected it.

Deputy Billy Ostermann testified that he was present when McChristian ordered cocaine worth $100 from the appellant. About fifteen minutes after McChristian's call, Doris Knox arrived and knocked on the door. When the agents answered the door, Knox dropped the cocaine onto the ground. Deputy Ostermann searched her and found on her person a plastic bag containing cocaine and a crack pipe with a push rod. He said that someone asked Knox "if she had anything else on her" and that she admitted having cocaine in her bra. Knox took the cocaine, which was wadded up in a napkin, out of her bra and gave it to Deputy Miller. Deputy Ostermann said that crack cocaine was commonly sold in plastic baggies and that it was not uncommon for drug dealers to pay their delivery people with drugs.

Doris Knox, the appellant's aunt, testified that she was supposed to deliver crack

cocaine to McChristian on April 15, 2009. The appellant gave the cocaine to Knox and told her to deliver it. Knox was supposed to collect $100 for the drug and take the money to the appellant. She was not going to receive anything from the appellant for making the delivery. Knox and her sister drove the appellant's car to the Blue Ribbon Inn, and Knox knocked on the door of room 20. Knox had her cocaine in her hand and was planning to smoke it with McChristian. When the agents opened the door, she dropped the cocaine. The agents searched her and found the baggie of cocaine that she was supposed to deliver to McChristian. Knox did not remember having cocaine in her bra, but she did not dispute that it happened, conceding that she was "high" at the time. Knox acknowledged that she had criminal charges pending against her and that she hoped to get favorable treatment from the State in exchange for her testimony.

On cross-examination, Knox testified that when the agents opened the door, someone grabbed her arm, causing her to drop the cocaine in her hand. She maintained that she had planned to smoke the cocaine with McChristian, whom she had known for ten to fifteen years.

Special Agent Laura Cole of the Tennessee Bureau of Investigation testified that she tested the cocaine collected from Knox. The cocaine dropped by Knox weighed .1 grams, the cocaine in the baggie weighed .85 grams, and the cocaine in the paper napkin weighed .11 grams.

The jury convicted the appellant of conspiracy to sell and deliver .5 grams or more of a Schedule II controlled substance. The trial court sentenced him as a Range III persistent offender to thirteen years, forty-five percent of which he was to serve in confinement before being eligible for release. On appeal, the appellant challenges the sufficiency of the evidence, the denial of his motion for a mistrial after prosecutorial misconduct, and the sentence imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction. However, the appellant has failed to cite to the record or any authority. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Nevertheless, we will briefly address the appellant's challenge to the sufficiency of the evidence.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellant was convicted of conspiracy to sell or deliver .5 grams or more of cocaine. Our criminal code provides that it is a Class B felony "for a defendant to knowingly . . . [s]ell a controlled substance," such as cocaine. Tenn. Code Ann. § 39-17-417(a)(3), (c)(1). Tennessee Code Annotated section 39-12-103(a) provides that the

> offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Additionally, "[t]he commission of an overt act in furtherance of the conspiracy is an essential element of the offense." State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). Generally, "conspiracy is an offense one (1) classification lower than the most serious offense that is the object of the conspiracy." Tenn. Code Ann. § 39-12-107(c). Therefore, conspiracy to sell or deliver .5 grams or more of any substance containing cocaine is a Class C felony.

At trial, the proof revealed that after the drug task force agents discovered crack cocaine in the motel room with McChristian and Butler, Deputy Miller asked McChristian to telephone his supplier, the appellant, to obtain more cocaine. McChristian called the appellant and asked for "a bill," which meant $100 worth of crack cocaine. The appellant said okay and that he or his "auntie" would deliver the cocaine in about ten minutes.

-5-

Approximately fifteen minutes later, Knox, the appellant's aunt, arrived at the Blue Ribbon Inn. She was driving the appellant's car and knocked on the door of McChristian's room. When she saw the agents, she dropped a small amount of crack cocaine onto the ground. After seeing the dropped cocaine, Deputy Ostermann searched Knox and found a plastic baggie containing .85 grams of cocaine in one of her pockets. Deputy Miller testified that the amount was worth approximately $100 and that Knox told him she was going to sell the bagged cocaine to McChristian. Further, Deputy Ostermann said that crack cocaine for sale was commonly packaged in plastic baggies. Knox testified that the appellant had given her the crack cocaine to take to McChristian and that she was supposed to obtain $100 from McChristian and take it to the appellant. From the foregoing, we conclude that there is ample evidence that the appellant "orchestrated" the sale and delivery of the cocaine to McChristian. See Thornton, 10 S.W.3d at 234.

## B. Mistrial Based on Prosecutorial Misconduct

The appellant contends that the trial court should have granted his motion for a mistrial because the State committed prosecutorial misconduct when it played for the jury an audio recording that included a "prejudicial preamble" by Deputy Miller. The State contends that the State did not commit prosecutorial misconduct and that the trial court properly denied the appellant's motion. We conclude that the prosecutor's conduct warranted a mistrial in this case.

Before trial, the State filed two motions, notifying the appellant of its intent to cross-examine him about his prior convictions pursuant to Rules 608 and 609, Tennessee Rule of Evidence. The appellant also filed a motion, arguing that his prior criminal convictions should be excluded under Tennessee Rules of Evidence 401, 402, 403, and 404. The appellant's motion stated that if the State intended to introduce such evidence, then the trial court should conduct a jury-out hearing to determine the evidence's admissibility.

During Deputy Miller's testimony, the State announced, without any objection from the defense, that it was going to make the audio recording of McChristian's telephone call to the appellant an exhibit and play it for the jury. The recording began with the following introductory comments made by Deputy Miller:

> Good evening. My name is Tim Miller, I'm the assistant director of [the] Seventeenth Judicial [District] Drug Task Force. Today's date is April the 15, 2009. The time on hand is approximately 10:20 in the p.m. I'm currently located here in Shelbyville, Bedford County, Tennessee. With me right now is Agent Billy Ostermann and Chad Webster with the Drug Task

Force. . . . Getting ready to make a recorded telephone call to Alfonzo Sutton. I'm familiar with Mr. Sutton; I have arrested him in the past. He's known to be involved in the distribution of crack cocaine. The number that's going to be called is (615) 870-6289, wherein $100 worth of crack cocaine will be ordered to come to room 20 at the Blue Ribbon Motel.

After the introductory remarks were played, defense counsel objected, and a bench conference was held. The trial court observed, "That introductory language is patently inadmissible. What do we do now? . . . It never dawned on me that they were going to start that tape with that on it." The defense moved for a mistrial, arguing that the State "had proposed that they would offer the text of the tape, and when they started playing the preamble of it, it was not the text of the tape. It was the introductory, which is not what the State offered would be played to the jury." The State advised the Court that it had provided the entire recording to the defense and that "[t]here has been ample opportunity for them to move to redact that, and so I provided it as though I was intending on playing the entire recording. I in no way limited it to that." The State also advised the court that it had not "sneaked" in Deputy Miller's introduction. The court overruled the motion for a mistrial but informed the parties that it was going to instruct the jurors to disregard "what they have heard up to this point on the tape." The trial court immediately instructed the jury as follows:

> [D]isregard that part of the tape that you heard up to this point. The introductory remarks by the witness are not part of the evidence in the case. Those representations which were made will not ever at any point be a part of this particular case, and it is absolutely urgently important that you disregard anything you have heard up to this point. What you are going to hear next is the actual recording. That's the evidence in this case, not the representations that have been made by [Deputy] Miller up to this point.

The appellant acknowledges that the State provided him with a copy of the recording in discovery and that he expected the State to play the recording for the jury. However, he argues that he "never anticipated that the Sate would choose to play inadmissible personal comments from a police officer, present on the tape, prior to the phone call itself." He contends that the trial court should have granted his motion for a mistrial because the State's conduct in playing Deputy Miller's introductory remarks was egregious and highly prejudicial.

A mistrial should be declared in criminal cases only in the event that a manifest

necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Tennessee Rule of Evidence 404 provides as follows:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> > (1) The court upon request must hold a hearing outside the jury's presence;
> >
> > (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> >
> > (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> >
> > (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985).

The State did not file a notice of intent to introduce Deputy Miller's introductory comments into evidence. Moreover, when the prosecutor announced that he was going to

play the recording for the jury, he specifically stated that he was going to play "a digital recording of the telephone call that has been referenced by [Deputy] Miller's testimony." The State never indicated to the defense or the trial court that it was going to play the portion of the recording that included Deputy Miller's comments about the appellant's prior bad acts. Tennessee Rule of Evidence Rule 404(b) specifically prohibited such evidence, and the trial court stated after the introduction was played that Deputy Miller's comments were "patently inadmissible." The appellant had filed a pretrial motion requesting a jury-out hearing if the State wanted to introduce such evidence. Therefore, the State should have informed the defense and the trial court of its plan to play the entire recording so that the trial court could hold a jury-out hearing pursuant to Rule 404(b). The State's actions amounted to prosecutorial misconduct.

Next, we must determine whether the appellant is entitled to relief. In order to prevail on a claim of prosecutorial misconduct, the appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor[.]
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). "The ultimate test for evaluating prosecutorial misconduct is 'whether the improper conduct could have affected the verdict to the prejudice of the defendant.'" Judge, 539 S.W.2d at 344.

The record reflects that the prosecutor's playing Deputy Miller's introductory comments was the State's only improper conduct during the trial. Moreover, no other errors exist in the record, and the trial court immediately ordered the jury to disregard that portion

of the recording. "It is presumed that the jury followed the trial judge's instruction[] not to consider inadmissible evidence." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). However, the introductory comments were highly prejudicial, and we agree with the appellant that the prosecutor's conduct was egregious in that the prosecutor appeared to be intentionally trying to prejudice the appellant. We note that the trial court's comments during the motion for new trial hearing demonstrate that the trial court also found the prosecutor's conduct to be egregious, stating,

> It absolutely should never have happened, and I am going to ask the State of Tennessee in the future to assure me that a tape that is being played by our drug task force has been reviewed by the State and that it does not contain any of those ridiculous preliminary statements which in this case identified this defendant as a drug dealer historically. Completely inappropriate for that to be presented. . . . It gives me grave concern[.]

Regarding the relative strength or weakness of the State's case, the trial court found during the motion for new trial hearing that the State's case was overwhelming and that the appellant was not entitled to relief because "the question for the jury was what amount of drugs was involved. That was really the crux of the defense. That was really frankly all they had." Granted, the appellant tried to convince the jury that the small amount of cocaine in his aunt's hand was what she intended to sell to McChristian. However, through cross-examination, the defense also tried to show that the jury should disbelieve Knox and McChristian, drug addicts hoping to receive favorable treatment from the State in return for their testifying against the appellant. In any event, although the State's case was strong, in our view, the highly prejudicial nature of the evidence and the prosecutor's intent in presenting the improper evidence warrant a new trial.

## C. Sentencing

Finally, the appellant challenges the length of the sentence imposed by the trial court. Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics

-10-

of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 345-46.

The appellant contends that his sentence is excessive and "not consistent with sentences other defendants obtain in other counties." However, the appellant does not argue

exactly how the trial court erred in sentencing him.

At the sentencing hearing, the trial court examined the appellant's presentence report and noted that the appellant had five prior felony convictions: four convictions for the distribution of crack cocaine and one conviction for reckless endangerment with a deadly weapon. The trial court determined, without objection, that the appellant was a Range III, persistent offender. See Tenn. Code Ann. § 40-35-107. The court noted that as a Range III offender convicted of a Class C felony, the appellant was subject to a sentence range of ten to fifteen years. See Tenn. Code Ann. § 40-35-112(c)(3).

The trial court noted that the appellant had no additional felony convictions "in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1). However, in applying enhancement factor (1), the court found that the appellant had numerous misdemeanor convictions. The trial court also found enhancement factor (2), that the appellant was a leader in the commission of the offense. Tenn. Code Ann. § 40-35-114(2). Finally, the trial court applied enhancement factor (8), that the appellant, "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(8). The trial court observed that the appellant had six prior probation revocations, making "enhancement factor 8 . . . present in a very significant way." The trial court found no mitigating factors. The court sentenced the appellant to thirteen years in the Tennessee Department of Correction, with forty-five percent of the sentence to be served in confinement before being eligible for release. We conclude that the trial court properly applied the enhancement factors and can find no error in the sentence imposed.

### III.  Conclusion

We conclude that the evidence is sufficient to support the appellant's conviction and that the trial court properly sentenced him but that the court erred by denying his motion for a mistrial based on prosecutorial misconduct. Accordingly, the appellant's conviction is reversed, and the case is remanded to the trial court for a new trial.

_____
NORMA McGEE OGLE, JUDGE